## *IN THE UNITED STATES COURT OF APPEALS*
## *FOR THE NINTH CIRCUIT*

| | |
|---|---|
| PROGRESSIVE DEMOCRATS FOR SOCIAL JUSTICE, KRISTA HENNEMAN, and CARLIE WARE, Plaintiffs-Appellants, | Case No. 22-15323 |
| *v.* | |
| ROB BONTA, in his official capacity as Attorney General for the State of California, Defendant-Appellee. | |

*On Appeal from the U.S. Dist. Ct. for the Northern District of California*
*No. 21-cv-3875, The Hon. Haywood Gilliam*

## BRIEF OF APPELLANTS

*/s/ Jason Harrow*
Jason Harrow
Charles Gerstein
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
Telephone: 323-744-5293
jason@gerstein-harrow.com

*Attorneys for Plaintiff-Appellant*

June 10, 2022

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant are two individuals and a non-profit entity. The non-profit certifies that there is neither a parent corporation nor any publicly held corporation that owns 10 percent or more of any of it.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ......................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES .................................................... iv

STATEMENT OF THE ISSUES FOR REVIEW ..................................... 1

STATEMENT OF JURISDICTION ......................................... 2

PRELIMINARY STATEMENT ................................................... 3

STATEMENT OF THE CASE ................................................. 6

I.   FACTS ....................................................................... 6

    A.   The History of California's Regulation of Employee
Political Speech ........................................................ 6

    B.   The Current Regime ............................................. 10

    C.   Plaintiffs' Political Speech ..................................... 13

II.  PROCEDURAL HISTORY ............................................. 16

STANDARD OF REVIEW ..................................................... 19

SUMMARY OF ARGUMENT ................................................. 20

ARGUMENT .......................................................................... 21

I.   CLOSE SCRUTINY APPLIES TO DISCRIMINAION
REGARDING WHICH EMPLOYEES MAY SOLICIT
POLITICAL CONTRIBUTIONS FROM OTHER
EMPLOYEES ................................................................. 21

A. The Equal Protection Clause and The First Amendment Both Require That Distinctions in Groups Permitted To Engage in Political Speech Be Justified. ................................ 21

B. The *Pickering* Test Does Not Apply ........................................ 30

II. SECTION 3205 IS NOT CLOSELY TAILORED TO ANY RATIONAL GOVERNMENT INTEREST, LET ALONE A COMPELLING ONE ........................................................ 37

A. The Legislative Record Offers No Support For The Differential Treatment Between State And Local Employees ................................................................ 37

B. The State's *Post-Hoc* Arguments in Support of The Differential Treatment Fail........................................................ 44

CONCLUSION ........................................................................ 49

CERTIFICATE OF COMPLIANCE ........................................ 50

# TABLE OF AUTHORITIES

**Cases**

*Bagley v. Washington Township Hosp. Dist.*, 65 Cal. 2d 499 (1966) ....................................................................... 6

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ......................................... 24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................... 22

*Carey v. Brown*, 447 U.S. 455 (1980) ..................................................... 25

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ................... 24

*Citizens United v. FEC*, 558 U.S. 310 (2010) ........................................ 24

*Fangman v. City of Cincinnati*, 634 F. Supp. 2d 872 (S.D. Ohio 2008) ..................................................................................... 27

*FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) ................................. 34

*FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480 (1985) ............................................................................................ 22

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ......................... 22

*Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016) ................. 20

*Fort v. Civ. Serv. Comm'n of the County of Alameda*, 61 Cal. 2d 331 (1964) .................................................................... 6

*Gaudiya Vaishnava Soc. v. San Francisco*, 900 F.2d 1369 (9th Cir. 1990) ........................................................................... 20

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974) .......................... 34

*Harwin v. Goleta Water District*, 953 F.2d 488 (9th Cir. 1991) ....................................................................................... 26, 29, 37

*Houston v. Hill*, 482 U.S. 451 (1987) ..................................................... 34

iv

*Jones v. Shalala*, 5 F.3d 447 (9th Cir. 1993) .......................................... 20

*Kennear v. City & County of San Francisco*, 61 Cal. 2d 341 (1964) ...................................................................................... 6

*Minority Television Project, Inc. v. FCC*, 676 F.3d 869 (9th Cir. 2012) ................................................................................ 38, 44

*Perry v. Los Angeles Police Department*, 121 F.3d 1365 (9th Cir. 1997) .................................................................. 20, 26, 28, 29

*Pickering v. Board Of Education*, 391 U.S. 563 (1968) .......... 1, 30, 33, 34

*Police Dep't, City of Chicago v. Mosley*, 408 U.S. 92 (1972)............. 25, 36

*Reno v. ACLU*, 521 U.S. 844 (1997)......................................................... 33

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014).................... 22, 26

*Russell v. Burris*, 146 F.3d 563 (8th Cir. 1998) ..................................... 27

*Scalia v. Emp'r Sols. Staffing Grp.*, 951 F.3d 1097 (9th Cir. 2020) ................................................................................... 19

*SEIU v. Fair Political Practices Commission*, 955 F.2d 1312 (9th Cir. 1992) .................................................. 25, 28, 29, 48

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973) ........................................................................ 24

*Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483 (1955) .................................................................................... 48

*Winters v. New York*, 333 U.S. 507 (1948)............................................... 34

*Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640 (7th Cir. 2013) ................................................................................. 8

**Statutes**

1935 Cal. Stats. Ch. 48.............................................................................. 6

1976 Cal. Session Laws Ch. 1422 ............................................................ 9

1995 Cal. Stats. Ch. 653 ........................................................................ 9

53 Stat. 1147 ......................................................................................... 6

Cal. Gov't Code § 19990.......................................................................... 11

**Other Authorities**

Cal. Bill Analysis, S.B. 1308, 1995–1996 Session (July 12, 1995)................................................................................................... 9

Giovanna Shay, *Similarly Situated*, 18 GEO. MASON L. REV. 581 (2011) ............................................................................... 30

Heidi Kitrosser, *Free Speech Aboard the Leaky Ship of State: Calibrating First Amendment Protections for Leakers of Classified Information*, 6 J. NAT'L SEC. L. & POL'Y 409 (2013) .......................................................................... 32

Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy: National Security Leaks and the First Amendment*, B.U. L. REV. 449 (2014) ..................................................................... 31

## STATEMENT OF THE ISSUES FOR REVIEW

California Government Code § 3205 makes it a crime for any *county* employee in California to solicit a political contribution from an employee of the same county, but the law permits any *state* employee to solicit a contribution from another state employee, so long as that solicitation does not run afoul of rules narrowly tailored to prevent corruption or its appearance. Plaintiffs claim that this discriminatory treatment violates their First Amendment and Equal Protection rights. The district court granted summary judgment to the Defendant. The issues presented on appeal are:

1. Whether the district court erred in applying the relatively government-friendly First Amendment standard derived from *Pickering v. Board Of Education*, 391 U.S. 563 (1968), where that standard has never been applied to a criminal prohibition and is inappropriate for the kind of *ex ante* speech at issue here?

2. Whether the district court erred in holding that the distinction has any reasoned justification, where the governor's legislative advisor could "find no reason for this unique treatment of State employees, vis-à-vis local agency employees"?

1

## STATEMENT OF JURISDICTION

a) The complaint in this case was initially filed on May 24, 2021, in the U.S. District Court for the Northern District of California.

b) This is an appeal from a summary judgment in favor of Defendant-Appellee Rob Bonta.

c) Judgment was entered on March 1, 2022, and the Notice of Appeal filed on March 3, 2022. ER-176. The notice was timely filed pursuant to Federal Rule of Appellate Procedure 4(a)(1).

## PRELIMINARY STATEMENT

Section 3205 of the California Government Code makes it a crime for any county employee in California to solicit any political contribution from any other employee of the same county, but the code allows any *state* employee to solicit a political contribution from any other state employee, including in the same office, and regardless of how politically sensitive the work of that office may be, so long as that solicitation does not run afoul of separate and more specific rules narrowly tailored to prevent corruption or its appearance. When the Legislature created this two-tiered system, the Governor's most senior advisor on the topic urged the Governor to veto the bill on the grounds that he could "find no reason for this unique treatment of State employees, vis-à-vis local agency employees." ER-100. But the bill was signed and the irrational distinction enshrined into law. This Court should hold the distinction unconstitutional.

Plaintiffs in this appeal are a Democratic political club, its founder and president (Krista Henneman), and one of its members (Carlie Ware). The Club's membership contains many Santa Clara County public defenders, and Henneman and Ware are public defenders. Plaintiffs

would like to solicit contributions from county employees to support political candidates who share their views. California law forbids them to do this, even though it would allow identically situated state employees to do so. Plaintiffs sued Defendant-Appellee Rob Bonta, the Attorney General of California seeking an injunction forbidding enforcement of § 3205 against them and a declaration that the law is unconstitutional. The district court (Gilliam, J.) upheld the law on an uncontested factual record, and this Court should reverse.

*First*, the district court gave the law here unwarranted deference. Restrictions on political solicitations must be "closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (quotation marks omitted). But the district court instead treated this case as if it were about workplace discipline, and "balance[ed] local employees' First Amendment rights against the government's justification for treating them differently from members of the public." ER-10. That was error because, among other reasons, the so-called *Pickering/Garcetti* standard has never before been applied to a criminal law, and the district court's extension of it to that new domain was unreasoned. It was also wrong: a citizen's First Amendment rights

4

may not be so easily overcome when the punishment is jail and the government acts not as an employer but pursuant to its police powers.

*Second*, under the proper standard—or, truly, under any standard—the record cannot support the distinction the Legislature made between county and state employees. Unusually for a case regarding this type of discrimination, the record contains evidence that lawmakers were aware of the distinction here and could not—indeed did not even attempt to—rationally justify it. The most obvious evidence: when the bill creating the distinction was presented to the Governor, his Director of Employee Relations wrote that he could "find no reason for this unique treatment of State employees, vis-à-vis local agency employees." The Governor signed it anyway. The district court dismissed this evidence and instead relied on the idea that courts should "give some deference to the reasoned decisionmaking of the California Legislature in adopting" the law, ER-17, even though the Legislature offered no reasoning at all—in other words, the district court held that the law is justified by the fact that it was passed. That is not how constitutional rights work. This Court should reverse.

5

## STATEMENT OF THE CASE

### I.   FACTS

The core of this case is the irrational and unsupported distinction that California law draws between the free-speech rights of its state employees and its local employees. This section primarily describes how that distinction was enshrined into law.

### A.   The History of California's Regulation of Employee Political Speech

California's regulation of employee political speech began in the 1930's and 40's, when State law—in line with federal law at the time, *see* 53 Stat. 1147 (enacting The Hatch Act of 1939)—generally forbade employees to take "an active part in a county or municipal political campaign." *See* 1935 Cal. Stats. Ch. 48. In the 1960's, the California Supreme Court issued several holdings narrowing the State's power to forbid employee political speech. *See, e.g.*, *Bagley v. Washington Township Hosp. Dist.*, 65 Cal. 2d 499 (1966); *Kennear v. City & County of San Francisco*, 61 Cal. 2d 341 (1964); *Fort v. Civ. Serv. Comm'n of the County of Alameda*, 61 Cal. 2d 331 (1964). In response to these decisions, the Legislature passed Government Code Section 3203, which said (and still does) that "[e]xcept as otherwise provided in this chapter, . . . no

6

restriction shall be placed on the political activities of any officer or employee of a state or local agency."

From the late 60's until 1976, though, *all* California government employees were restricted from soliciting their colleagues for political contributions, at all times. ER-113 (reproducing prior § 3202, banning local agency employees from all political solicitations to their colleagues); ER-130 (reproducing prior § 19730, banning state employees from all political solicitations to their colleagues); ER-47 (noting that AB 4351 of 1976 would repeal the respective chapters of the Government Code containing those two provisions). And when Assembly Bill 4351 was introduced in 1976 to repeal certain "broad restrictions on the rights of state and local public employees to engage in political activity," it initially "repealed without reenacting the prohibition on state or local employees soliciting or receiving political contributions from other employees." ER-70. The equal treatment between state and local employees was to be maintained even as restrictions would be eased.

But that is not the law that the Legislature passed. Interest groups weighed in, and the California State Employees' Association supported the bill, ER-83, but the State Personnel Board opposed it on the grounds

7

that the proposed amendments "would be detrimental to the administration of a State service merit system free from . . . political influence," ER-84. The Cities of Sacramento and Los Angeles initially opposed the bill too. ER-86, 104. Then, for reasons that are not explained in the legislative record, the bill was revised to ban political solicitations of colleagues by local employees only. ER-93 (describing amendment). It is not clear why the Legislature decided to mollify the cities—Sacramento changed its view and formally registered its support for the revised bill, ER-85—but not address the concerns of the California State Personnel Board with respect to state employees. But that happens in the legislative process. "As unfortunate as it may be, political favoritism is a frequent aspect of legislative action." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 654 (7th Cir. 2013).

The Governor's chief advisor on personnel issues, Marty Morgenstern (then the Director of the Office of Employee Relations), identified this disparate treatment as a potential legal problem. "I can find no reason for this unique treatment of State employees, vis-à-vis local agency employees," he wrote. ER-100. He continued: "I would recommend against signing this bill, at least until we could determine

8

the rationale for this distinction." *Id.* The Business and Transportation Agency also opposed the 1976 change. ER-101–02. But there is no evidence that Morgenstern's concern with the differential treatment was addressed or that any evidence or reasoned consideration was ever offered to rebut it. Instead, on September 30, 1976, Governor Brown signed the Bill into law. 1976 Cal. Session Laws Ch. 1422.

The unreasoned, unexplained distinction between the rights to solicit contributions of state employees on the one hand and local agency employees on the other has persisted since 1976. The only subsequent amendment, from 1995, added criminal sanctions to unlawful solicitations by local employees. 1995 Cal. Stats. Ch. 653. And the sole stated rationale given for the most recent amendments applies equally to state and local employees: that "neither [governmental] employees nor officers should be coerced into contributions for fear that their employment may be in jeopardy if they do not contribute." Cal. Bill Analysis, S.B. 1308, 1995–1996 Session (July 12, 1995). Yet, while the Legislature's stated reasoning would seemingly require that all public employees be broadly prohibited from making political solicitations, the

bill's text preserved the 1976 distinction between the solicitation rights of state employees on the one hand and local employees on the other.

## B.  The Current Regime

Government Code § 3205(a), the law challenged here, provides that "[a]n officer or employee of a local agency shall not, directly or indirectly, solicit a political contribution from an officer or employee of that agency . . . with knowledge that the person from whom the contribution is solicited is an officer or employee of that agency." The only exception is for any generalized "solicitation made to a significant segment of the public which may include officers or employees of that local agency," *id.* § 3205(c), but many County employees may neither have access to, nor desire to engage in, the necessarily broad (and, therefore, frequently expensive) communications permitted by this subsection.

By contrast, it is uncontested—indeed, it is affirmed by stipulation—that State employees may generally engage in the type of purely personal, outside-of-work political solicitations of their colleagues that local employees may not do. ER-138–39, ¶¶ 31–33. State employee solicitations are subject only to general ethics rules, which have been interpreted to prohibit state employees from, among other things, using

10

the workplace, state resources, or their position or title as a state employee to engage in partisan political fundraising. ER-136–37, ¶¶ 27–28. State employees are also prohibited from engaging in partisan political fundraising during work hours. *Id.* And state employee supervisors are prohibited from imposing undue pressure on subordinates through the solicitation of political donations. *Id.*; *see also* Cal. Gov't Code § 19990. But this is the extent of the restriction on political activity of state employees. The State stipulated below that no state rule or regulation bans state employees from soliciting political contributions from their colleagues and that no state agency has banned such solicitation. ER-138, ¶¶ 29–32.

The record shows that these personal political solicitations that state employees may make have caused no actual harm to the State or the state workforce. State employees have since at least 1976 been permitted to make the kinds of personal political solicitations plaintiffs wish to make, but the State has stipulated that it has identified exactly zero instances of such an employee causing any of the problems that the narrower rules sought to prevent. ER-137–38, ¶¶ 29, 30.

11

The distinction in the law is insensitive to the nature of any public employee's job. Attorneys, custodians, and administrative assistants alike may not solicit political contributions from their colleagues if they work for a County or municipality, even if those solicitations come outside of work, have no connection to work, use no work resources, and do not mention work at all. § 3205(a); ER-134, ¶ 14. But attorneys, custodians, and administrative assistants who work for the state may solicit political contributions from other state employees so long as they do not do so in the office or using office resources. ER-137–39, ¶¶ 28–32.

Thus, as the undisputed facts make clear, lawyers who work for Santa Clara County commit a misdemeanor when they solicit campaign contributions for a nationwide political race with no connection to the County from any other employee of that agency, but lawyers at the State Department of Justice are free to solicit campaign contributions from colleagues for any race, including those—like the race for Attorney General—that directly influence their work (so long as those state employees comply with other, narrow restrictions). ER-134, 137–39 ¶¶ 14, 32–33. The law criminalizes solicitation by wholly non-partisan county employees, such as custodians, electricians, and other

maintenance professionals, but it protects such solicitation by employees of the Political Reform Division of the Secretary of State's Office, who are tasked with enforcing the State's campaign-finance rules. For State employees of all stripes, restrictions on using office space, resources, or titles for political solicitation have proven sufficient to prevent whatever harms may obtain from such solicitation. ER-137, ¶ 28. Yet county employees are still subject to a broad restriction on all such solicitations.

### C.   Plaintiffs' Political Speech

Plaintiffs are a political club, its founder, and one of its members. *See* ER-142, ¶ 4. The principal purposes of the Club include identifying and supporting candidates for elective office and inspiring grassroots participation in the political process. *Id.* ¶ 4. Almost half of the members of the Club are county employees. ER-146, ¶¶ 5–6. Henneman and Ware are career public defenders. *See* ER-143, ¶ 10; ER-146–47, ¶ 13. At the time the district court briefs were filed, neither Henneman nor Ware had supervisory authority over any other County employee, *see* ER-143 ¶ 13; ER-147, ¶ 15, and neither intends (nor seeks authorization) to solicit

campaign contributions while at work, while using work resources, or relying on her official title, ER-143 ¶ 14; ER-147, ¶ 16.[1]

In 2021, Sajid Khan, a Santa Clara County public defender, announced that he was running for district attorney. Plaintiffs wanted to support the Khan campaign, which had compiled a list of people to email, call, visit, and ask for campaign contributions. ER-146, ¶ 8. Henneman and Ware may not directly solicit those on the list that also work for Santa Clara County. ER-134, ¶ 14. Plaintiffs believe, and have been advised, that person-to-person requests are significantly more likely to succeed than general ones. ER-142, ¶ 9. But because of § 3205, Plaintiffs may not contact people whom they know to be County employees, and whom they would call to solicit contributions if § 3205 did not criminalize doing so. There are many such people.

Plaintiffs continue to reasonably fear prosecution if they engage in direct solicitation of their colleagues for any future campaign. ER-142–43, ¶¶ 10–11; ER-146–47, ¶¶ 13–14. This fear stems not only from the

---

[1] Ware has since been promoted and, as of the date of this brief, she oversees a small team of lawyers, investigators, a social worker, and a paralegal in the Pre-Arraignment Representation & Review unit.

fact that their proposed conduct violates the terms of § 3205, but also because they were warned in advance of the application of this provision. On August 11, 2020, Henneman and Ware received a memo that was distributed to all Santa Clara County employees titled "Re Campaign Activities by County Employees" and stating in part that "Government Code 3205 prohibits County officers or employees, including office holders or candidates for office, from soliciting political contributions directly or indirectly from other County officers of employees with knowledge that the person from whom the contribution is solicited is an officer or employee of the County. A violation of this section is punishable as a misdemeanor." ER-143, ¶ 14; ER-147, ¶ 17. In the course of this litigation, Bonta has affirmed his office's view that Henneman and Ware's desired conduct is prohibited by § 3205. Indeed, he has stated that criminal prosecution would not only be appropriate under § 3205 but that, if he were to let the law go unenforced, it would "potentially harken the return of political corruption that plagued such agencies in the early part of the last century." D. Ct. ECF No. 19 at 2.

Although the primary election that was the immediate impetus for this suit has now concluded, Plaintiffs also wish to contact their

colleagues to make political solicitations for other political campaigns. ER-134, ¶ 10; ER-142–43, ¶¶ 10–11; ER-146–47, ¶¶ 13–14. But they may not do so as long as § 3205 remains effective, regardless of whether the race is local, state, or federal.

## II. PROCEDURAL HISTORY

Plaintiffs filed this case on May 24, 2021, and they immediately sought a preliminary injunction against enforcement of the law during the pendency of the case. ER-169–75; ER-149–61. Because the Khan campaign was set to launch on July 1, 2021, and because Plaintiffs would be irreparably harmed if they were unable to get an early start on key person-to-person fundraising, Plaintiffs sought a hearing—with Bonta's consent—on or before June 28, 2021. Under the local rules of the Northern District of California, this meant that Plaintiffs' request was technically styled as an ex parte request for a temporary restraining order, though Bonta submitted full briefing and the district court held a length oral argument. *See* N.D. Cal. Civil Local R. 7-2, 65-1, 65-2 (specifying required notice for a motion, including motion for preliminary injunction, and requirements for TRO).

The district court denied Plaintiffs' TRO request following a motion hearing. In its opinion denying the TRO, the district court primarily relied on the idea that, at that early stage, the court was unsure whether state and local employees were actually treated differently under California law. The court at that point accepted the State's "suggest[ion] that soliciting campaign contributions from other state employees could run afoul of [the California Government Code's general ethics rules] as in conflict with or inimical to the state employees' duties." ER-162. On the record as it stood at the TRO stage, it was "not clear" to the court "whether state employees are permitted to solicit campaign contributions in the manner prohibited under § 3205." ER-162.

The court then assumed that there was some sort of differential treatment and upheld the law anyway. The court applied the *Pickering* balancing test to Plaintiffs' claims despite recognizing that it had never before been applied to a criminal punishment. ER-160. In applying that test, the court recognized "that the legislative history is thin, and it does not appear to explain why state and local employees are treated differently under § 3205." ER-161. But the court still deferred to the State and refused to grant a TRO, perhaps guided by its view that Plaintiffs

were seeking a "mandatory," rather than "prohibitory" injunction (even though they asked for nothing other than a prohibition against enforcing a law against them) and that their requested injunction would apply only to them, allowing prosecution against other county employees in an unfair way (even though Plaintiffs explicitly disclaimed this at the hearing). ER-165–67.

The parties then cross-moved for summary judgment based on a factual record that consisted of joint stipulations, uncontested declarations, and approximately one hundred pages of authenticated legislative history. After the State researched the history of the relevant regulations and their enforcement, it abandoned its prior argument that state and local employees were subject to similar prohibitions on political solicitations. Instead, the State stipulated that it is not "aware of a California statute, rule, or regulation that prohibits all forms of political solicitations from one state employee to another state employee," and that it could find no record of any state employee being disciplined or otherwise sanctioned for the kind of political solicitation that could send a local employee to jail. ER-137–39, ¶¶ 28–33.

The district court nonetheless granted the State's motion for summary judgment. The district court's opinion first explained that the government's "strong interest in protecting . . . public employees from political pressure . . . strongly supports Defendant's argument that § 3205 is unconstitutional," ER-14–15, even though the government's general anti-corruption interest is both uncontested and unrelated to whether the discriminatory treatment is permissible. The district court recognized that the Governor's chief advisor "could not see a reason in the record to distinguish between state and local employees," but it gave this fact minimal weight and instead gave "some deference to the reasoned decision-making of the California Legislature in adopting and upholding § 3205 over the past several decades." ER-17. The district court did not specifically explain what the Legislature's "reasoned decisionmaking" consisted of.

Plaintiffs timely noticed an appeal to this Court.

## STANDARD OF REVIEW

This Court reviews de novo all aspects of this case. That is, this Court "review[s] de novo a grant of summary judgment." *Scalia v. Emp'r Sols. Staffing Grp.*, 951 F.3d 1097, 1101 (9th Cir. 2020). And the Court

"also review[s] de novo 'the application of legal principles to established facts.'" *Id.* (quoting *Flores v. City of San Gabriel*, 824 F.3d 890, 905 (9th Cir. 2016)). In other words, "[b]ecause the facts are not disputed, [the Court] review[s] on purely legal grounds the judgment on cross-motions for summary judgment." *Jones v. Shalala*, 5 F.3d 447, 450 (9th Cir. 1993); *see also Gaudiya Vaishnava Soc. v. San Francisco*, 900 F.2d 1369, 1373 (9th Cir. 1990) ("Because this [appeal] involves the application of undisputed facts to constitutional law, this review is done de novo."); *Perry v. Los Angeles Police Department*, 121 F.3d 1365, 1368 (9th Cir. 1997) ("A district court's determinations on questions of law and on mixed questions of law and fact that implicate constitutional rights are reviewed de novo.").

## SUMMARY OF ARGUMENT

Section 3205 undisputedly infringes on a fundamental right: the right to political speech. It does so in a way that discriminates among public employees for no good reason. Even assuming the government has some leeway to be only minimally rational in the context of ordinary legislation, it may not do so when it comes to political speech. The law is unconstitutional. The district court's contrary conclusion relied on two

key errors: it applied the wrong standard, and it gave undue deference to the Legislature's unreasoned decisionmaking. Its judgment should be reversed.

## ARGUMENT

### I. CLOSE SCRUTINY APPLIES TO DISCRIMINAION REGARDING WHICH EMPLOYEES MAY SOLICIT POLITICAL CONTRIBUTIONS FROM OTHER EMPLOYEES

#### A. The Equal Protection Clause and The First Amendment Both Require That Distinctions in Groups Permitted To Engage in Political Speech Be Justified.

This case arises at the intersection of two lines of Constitutional doctrine: The First Amendment rules governing restrictions on political contributions, and the Equal Protection rules governing discrimination in the restriction of fundamental rights. But whether examined through the lens of the First or Fourteenth Amendment, the result is the same: where, as here, the government criminalizes the speech of some people but permits identical speech of similarly situated people, courts must subject that restriction to close scrutiny. Under that standard, the government must justify its discrimination by showing that it is at least

21

reasonably necessary to forward a serious government interest. The State cannot meet that burden here.

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality op.). Americans "exercise that right in a variety of ways: They can run for office themselves, vote, urge others to vote for a particular candidate, volunteer to work on a campaign, and contribute to a candidate's campaign." *Id.* Because of the centrality of democratic politics to the First Amendment, the Supreme Court has held that rules restricting political contributions must be "'closely drawn to avoid unnecessary abridgement of associational freedoms,'" *id.* at 197 (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam)), and must be targeted at a government interest that is at least "important," and perhaps "compelling," *id.* at 199 (quotation marks omitted). Lower courts have explained that this test is "not quite the same thing" as strict scrutiny, but that it is "something pretty close." *Riddle v. Hickenlooper*, 742 F.3d 922, 931 (10th Cir. 2014) (Gorsuch, J., concurring); *see also Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1652 (2022) (declining to decide

whether "strict or 'closely drawn' scrutiny should apply" to political speech restriction because law failed under either standard).

The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." *Id.* Because government employees perform governmental functions, the interest in prevention of corruption can be somewhat different than with respect to the average citizen. Decades ago, the Supreme Court said that the following rationales are sufficient to sustain restrictions on the political activities of government employees: regulations may ensure (1) "that employment and advancement in the Government service not depend on political performance"; (2) "that Government employees [are] free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs"; (3) "[that civil servants] administer the law in accordance with the will of [the government], rather than in accordance with their own or the will of a political party,'" and (4) "that the Government and its employees [not only] in fact avoid practicing political justice, but . . . also . . . that they appear to the public to be avoiding it." *U.S. Civil Serv. Comm'n v. Nat'l*

23

*Ass'n of Letter Carriers*, 413 U.S. 548, 564–66 (1973); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 606 (1973). All agree that these interests could support a prohibition on political solicitation by *all* of California's public employees.

But the fact that a law abridging First Amendment freedoms could be constitutional if given a proper scope does not mean that a similar law is permissible if the government decides to criminalize the speech only of a disfavored class of speakers. That is because courts closely scrutinize government distinctions among speakers. In *Citizens United v. FEC*, for example, the Supreme Court explained that the First Amendment also "[p]rohibit[s] . . . restrictions distinguishing among different speakers, allowing speech by some but not others." 558 U.S. 310, 340 (2010). Similarly, in *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), the Supreme Court held unconstitutional under the First Amendment an ordinance banning newsracks containing "commercial handbills" but permitting the same racks containing "newspapers" because there was "insufficient justification for the discrimination." *Id.* at 418.

While the First Amendment seems the most appropriate lens, especially after *Citizens United*, the Supreme Court has sometimes

24

invoked the Equal Protection Clause in making the same point. *See, e.g.*, *Carey v. Brown*, 447 U.S. 455, 461–62 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized"); *Police Dep't, City of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives.").

This Court, too, has primarily viewed this type of impermissible classification through the lens of traditional First Amendment scrutiny. In *SEIU v. Fair Political Practices Commission*, 955 F.2d 1312 (9th Cir. 1992), the court stated that "discrimination is permissible in the First Amendment context only when the discrimination is itself necessary to achieve a substantial governmental interest." *Id.* at 1319. Because the political contribution limits there could not be justified, they were invalidated under the First Amendment. *Id.* And in *Perry v. Los Angeles Police Department*, this Court applied First Amendment narrow tailoring

to strike down an ordinance that permitted non-profit enterprises to solicit donations on Venice Beach but barred solicitations by others, including unincorporated groups. 121 F.3d at 1368 (noting the claims were "rooted in the First Amendment"). The Equal Protection Clause has occasionally also been invoked in this Court, but, as this Court observed in *Harwin v. Goleta Water District*, 953 F.2d 488 (9th Cir. 1991), "[u]nder either analysis . . . independent justification of the discrimination is required." *Id.* at 490 n.3; *see also id.* at 491 n.6 ("Whether analyzed under the First Amendment or under the Equal Protection Clause of the Fourteenth Amendment, discriminatory burdens on First Amendment rights have typically been subjected to strict scrutiny." (citation omitted)).

Other courts have similarly invalidated discriminatory political-speech restrictions under the First Amendment and the Equal Protection Clause. In *Riddle*, for example, the Tenth Circuit, in an opinion joined by then-Judge Gorsuch, held that a rule imposing lower contribution limits on candidates from independent and small-party candidates than on those from major parties violated the Equal Protection Clause. *Riddle*, 742 F.3d at 928. The Court applied strict scrutiny to the distinction and

concluded that it could not stand even though major-party candidates were much more likely to stand for more than one election per cycle (a primary and a general election). *Id.*; *see also Russell v. Burris*, 146 F.3d 563, 571–72 (8th Cir. 1998) (holding that a statute was not narrowly tailored to combat corruption when it allowed some political action committees to contribute 2.5 times the amount that most others could contribute); *Fangman v. City of Cincinnati*, 634 F. Supp. 2d 872, 880 (S.D. Ohio 2008) (holding that city contribution restriction violates First Amendment because "it makes no sense to permit donations to candidates for non-Ohio federal elections and to exclude donations to candidates for Ohio federal elections and out-of-state elections since none of those candidates supervise the daily work of city employees" (internal quotation marks omitted)).

The district court's failure to treat this case consistently with this precedent led it to make two key errors. *First*, the district court failed to apply a searching standard to the discriminatory treatment. To be sure, the district court correctly recognized that "the government's stated justification for the regulation of speech must be more than merely speculative . . . [so] mere speculation will not suffice to support the

27

constitutionality of § 3205." ER-10. But in the very next sentence, the district court stated that "[a]t bottom . . . the Court must still weigh the interests of local employees against the interest of the government in restricting their ability to solicit campaign contributions from other local employees." ER-10. But that is not what the caselaw says the court must weigh. The court must assess the government's interest in a *discriminatory* regulation impacting core political speech. *SEIU*, 955 F.2d at 1319 ("[D]iscrimination is permissible in the First Amendment context only when the discrimination is itself necessary to achieve a substantial governmental interest.") The question is not whether the regulation in general is permissible; it is whether the discrimination is.

*Perry* is a good example of the proper axis of inquiry. This Court accepted that Los Angeles could ban *all* solicitations on the Venice Boardwalk because the "City has a legitimate interest in protecting merchants from unfair competition and in aiding the free flow of traffic." 121 F.3d at 1367. And a total ban would serve that end because "[a] decrease in the total number of vendors on the Boardwalk would aid that interest." *Id*. Nonetheless, the more selective law at issue there was invalid under the First Amendment because "there is no justification for

eliminating only those individuals with no nonprofit affiliation." *Id.*; *see also id.* ("There is no evidence that those without nonprofit status are any more cumbersome upon fair competition or free traffic flow than those with nonprofit status."). So too here. The court must evaluate the reasons for the distinction, not the reason for regulation in the first place.

*Second*, the district court's using the improper framework led it to spend pages on an inapplicable threshold question: whether state and local public employees are similarly situated. ER-23–26. Again, courts that analyze whether the First Amendment has been violated because the State has impermissibly favored some speakers over others typically do not engage in this analysis at the threshold. *See generally SEIU*, 955 F.2d at 1319; *Perry*, 121 F.3d at 1368; *Harwin*, 953 F.2d at 490. Rather, courts implicitly recognize that everyone has base First Amendment rights, and the proper inquiry tracks whether the government has a reasoned justification for treating one speaker differently from another speaker. Thus, the district court's rigid, threshold analysis only serves to needlessly complicate the inquiry. Whether the government can justify granting state and local employees different First Amendment rights is

29

the heart of the constitutional inquiry, not something that exists merely at the threshold.[2]

## B.   The *Pickering* Test Does Not Apply

In articulating the framework to evaluate the speech restriction here, the district court granted the State special solicitude under a standard that gives the government substantial leeway to impose workplace discipline on its employees without violating the First Amendment. ER-7–10. The application of this so-called *Pickering*/*Garcetti* framework was unprecedented and incorrect.

The balancing test the district court used derives from *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny. As the Supreme Court explained in *Pickering*, the government "has interests *as*

---

[2] Some in the legal academy have argued that "properly understood, 'similarly situated' is not a threshold hurdle to equal protection analysis on the merits in cases involving facial classifications." Giovanna Shay, *Similarly Situated*, 18 GEO. MASON L. REV. 581, 588 (2011). That is because "the focus of the 'similarly situated' analysis is substantially the same as the key inquiry of equal protection review: Does the legislative classification bear a close enough relationship to the purpose of the statute?" *Id.* That is likely true here too: no matter how it's couched, the inquiry in this appeal is whether the Legislature's decision to classify state employees and local employees differently furthers any compelling purpose as supported by evidence.

*an employer* in regulating the speech of *its employees* that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568 (emphasis added). For decades, this doctrine has permitted governments leeway to impose workplace discipline or other kinds of civil penalties on their own employees as a result of their speech. That makes sense: governments, after all, are among the largest employers in the country, and if every statement of every public employee were subjected to strict scrutiny before the government could suspend or fire an employee, then the "efficiency of . . . public services" would be hopelessly compromised. *Id.*

But *Pickering* and its progeny do not apply here. As the district court acknowledged, the standard, which was first articulated in 1968, has never before been applied to evaluate the constitutionality of a criminal law. ER-160 (analysis in TRO opinion), ER-8 (adopting TRO analysis on this point); *see also, e.g.*, Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy: National Security Leaks and the First Amendment*, B.U. L. REV. 449, 535 (2014). ("[The] *Pickering* balancing test arose and has been applied exclusively in the context of challenges to civil sanctions and adverse employment actions, not criminal

charges.") This makes sense. After all, "[i]n the context of government employment, the government should have more power to impose employment-related sanctions on its employees than it should have to impose criminal sanctions." *Id.* As another scholar explained, the "government's case for control is at its apex" when it comes to "employment-based, administrative sanctions," but the argument for reduced First Amendment protection "become[s] more strained when the government seeks to step out of its employer role and into its sovereign role to prosecute employees criminally." Heidi Kitrosser, *Free Speech Aboard the Leaky Ship of State: Calibrating First Amendment Protections for Leakers of Classified Information*, 6 J. NAT'L SEC. L. & POL'Y 409, 441 (2013).

Despite the fact that the doctrine has existed for decades and been cited thousands of times in the civil context and apparently zero times to evaluate a criminal law, the district court imposed an impossibly high burden to show that *Pickering* is inapplicable here: it applied the doctrine because Plaintiffs had not "cited any case law supporting the claim that *Pickering* should *not* apply where there are criminal—as well as employment—consequences." ER-160 (emphasis added). That is like

saying that Australian law applies to this case because no case law says it shouldn't. Of course there's no such case: Australian law, by its own terms, was never designed to govern the First Amendment rights of U.S. public employees. So too with *Pickering*, which is about workplace discipline and regulation. In a free society, the government does not jail citizens who disrupt workplaces that happen to be operated by the government; when the State puts someone in jail, it acts as sovereign, not as employer. Indeed, the fit is particularly poor here because the defendant is an agency of the State and so is not even Plaintiffs' employer. The district court fails to explain how the State can use *Pickering* to invoke its interest "as an employer" when it purports to be able to jail Plaintiffs and doesn't even employ them.

In any event, the Supreme Court has repeatedly rejected the district court's idea that First Amendment analyses can just be lifted from civil sanctions to criminal ones. In *Reno v. ACLU*, 521 U.S. 844 (1997), the Court struck down as overbroad a law that criminalized certain speech and said the law was a "matter of special concern" because it was a "criminal statute." *Id.* at 872. The Court was clear that the "opprobrium and stigma of criminal conviction" plus the "severity of

criminal sanctions . . . pose[] grater First Amendment concerns than those implicated by [] civil regulation." *Id.* In *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978), the Court upheld an administrative fine against a broadcaster that used an expletive over-the-air but said that it was *not* also holding that such a broadcast "would justify a criminal prosecution." *Id.* at 750. And the Court has held that the "state interest" in regulating defamatory speech "extends no further than compensation for actual injury." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348 (1974).[3] The district court did not explain in either of its two opinions why that reasoning does not also apply here.

Finally, *Pickering* is also inapplicable because it fails to capture the discriminatory-treatment aspect of this case. Under *Pickering*, "a court must balance the First Amendment claims of an employee versus the justification the government has for treating the employee differently

---

[3] Other examples abound. *Houston v. Hill*, 482 U.S. 451, 459 (1987) (reasoning that "[c]riminal statutes must be scrutinized with particular care" in First Amendment overbreadth and vagueness cases); *Winters v. New York*, 333 U.S. 507, 515 (1948) (reasoning that "[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement" in free speech cases).

from any member of the public." ER-8 (quotation marks omitted). The district court failed to recognize that the result of that balancing test is not contested: under binding Supreme Court precedent, the State's interest in preventing corruption is sufficient to limit the political speech of *all* public employees. If all of California's employees were treated equally, there would be no case. But they are not. The question is what justifies *the discriminatory treatment*, not the regulation. On that issue, *Pickering* has nothing to say.

This error can be seen by replacing "local" and "state" with any other distinction. If the only public employees barred from making political solicitations were public school science teachers, but math teachers were allowed to engage in the same speech, then no one would argue that *Pickering* would be relevant to such a law's constitutionality; all would agree that a solicitation ban with the proper scope would be permissible. Rather, the question would be: what compelling interest supports banning science teachers' political speech but permitting the same speech by math teachers, and is the law narrowly tailored to that specific interest? It is the distinction that demands close scrutiny, not the idea of the ban. There is no support in case law (or logic) that *Pickering*

and its progeny are relevant to that question. If they were, then *Pickering* would somehow grant governments special leeway to make ill-supported distinctions in First Amendment rights among public employees it could not make among the citizenry at-large. There is no support for that proposition.

Finally, even assuming *Pickering* applies, this Court must apply a particularly searching version of it that requires the State to use evidence to justify its discriminatory ban. That is because where the government imposes speech-restrictive rules *before* employees speak, the government must "do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. National Treasury Employees Union* ["*NTEU*"], 513 U.S. 454, 475 (1995) (citation, internal quotation marks, and source's alteration marks omitted). Or, looked at through a slightly different constitutional lens, "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Mosley*, 408 U.S. at 101. Either way, there must be some actual evidence for the government's

reason for making a distinction and some consideration of whether the restriction furthers that reason.

It is the evidence—or, rather, lack thereof—for the distinction between state and local employees to which this brief now turns.

## II. SECTION 3205 IS NOT CLOSELY TAILORED TO ANY RATIONAL GOVERNMENT INTEREST, LET ALONE A COMPELLING ONE

### A. The Legislative Record Offers No Support For The Differential Treatment Between State And Local Employees

The district court recognized that "it is uncontested that only local employees are subject to § 3205, while state employees are not." ER-23 The question, then, is whether there is an "independent justification of the discrimination." *Harwin*, 953 F.2d at 490 n.3. In searching for that independent justification, the district court acknowledged that the "government's stated justification . . . must be more than merely speculative." ER-10. That is, "the government must prove both the reality of the recited harms and that the statute does not burden more speech than necessary" with "substantial evidence in the [legislative] record." *Minority Television Project, Inc. v. FCC*, 676 F.3d 869, 880 (9th Cir. 2012); *see also Harwin*, 953 F.2d at 491 (reversing the district's decision that

the ordinance was constitutional because "[t]he district court's conclusion about the impact of the ordinance . . . has no basis in the evidentiary record.").

The State cannot meet that standard here. The legislative record is devoid of support for the distinction.

As explained above, the distinction between state and local employees first appeared in 1976. There is no stated explanation for the differential treatment, and the district court cites none from the record. Instead, based on the timing of the legislative alteration, the record shows that the change was the result of legislative favoritism or horse-trading. That is, the novel distinction between state and local employees was introduced in response to lobbying by a few cities who wanted the ban to cover their employees but did not care whether the ban also applied to state employees. *See supra* at Statement § I.A.

Indeed, this is the unusual case where an advisor to the executive specifically noticed this feature of the legislative process. The Governor's chief advisor on personnel issues, Marty Morgenstern, wrote that he "can find no reason for this unique treatment of State employees, vis-à-vis local agency employees." ER-100. Thus, he "would recommend against

38

signing this bill, at least until we could determine the rationale for this distinction." ER-100. This Court does not often see cases where those involved in lawmaking say the quiet part out loud. But that is what happened here.

The district court's contrary conclusion is belied by the record. To support the conclusion that treating state and local employees differently was justified, the district court makes a series of assertions that lack citations because they lack support. For instance, the district court reasoned that "[t]he legislative history . . . indicates that there was a specific concern about the uniformity of restrictions on local employees' speech in particular." ER-19. Elsewhere, the district court stated that "the legislative history, when read in its entirety, indicates that a lack of uniformity was a distinct problem among local agencies across the state." The district court offers no support for these contentions. ER-16. And there is *no* evidence, *anywhere* in the legislative record, that the Legislature had *any* concern about the uniformity of local rules.

Elsewhere, the district court stated that "the Legislature identified possible distinctions between state and local employees." ER-20. This statement, too, lacks any citation. But it may refer to the fact that one

Assemblymember, John Vasconcellos, responded specifically to the opposition of the State Personnel Board and wrote that the legislative change "guarantees [state employees] the right to be political, and with plenty of precautions and protections." ER-105. But Member Vasconcellos did not explain why the same "precautions and protections" were insufficient to protect the local workforce, and the district court did not explain the connection. Instead, the court stated that "this history can be . . . read to suggest that the Legislature was responding to the evidence before it." ER-17. But there was no evidence that there was any relevant difference between state and local employees when it comes to personal political solicitations, so the Legislature could not have been responding to that.

The district court's treatment of Morgenstern's remarkably candid assessment of the legislative record is difficult to understand. First, the district court attempted to minimize Morgenstern's conclusion on the grounds that, "[f]ar from thinking that corruption and coercion were no longer problems in California, [Morgenstern] appeared to believe that the solicitation ban should continue as to state employees as well." ER-16. But that's exactly Plaintiffs' core point: any Legislature that rationally

addresses the problem of public employee corruption must either apply the restrictions here to state and local employees, or to none of them. The district court's observation that Morgenstern reached the same conclusion thus supports the idea that the Legislature acted irrationally by making a distinction without justification.

Second, the district court purported to disregard Morgenstern's conclusion on the grounds that "Plaintiffs offer no reason to credit this single, unelected advisor's opinion over the official decision-making of the California Legislature and the Governor himself." ER-17. But that is not accurate. Neither the Legislature nor the Governor offered any reason for the state–local distinction; they just proceeded apace with the lawmaking. The reason to credit Morgenstern's observation, then, is that it is the only possible conclusion one can draw from the legislative record.

Indeed, the district court's contrary conclusion explicitly relies not on evidence in the record but on the lack thereof. After claiming that Morgenstern's observation might not be credible, the district court argued that it "must give some deference to the reasoned decision-making of the California Legislature in adopting and upholding § 3205 over the past several decades." ER-17. The problem, though, is there is

41

nothing to defer to. The district court's reasoning assumes away the whole inquiry. According to the district court, the state–local distinction was justified because that is the distinction the Legislature made, and deference is warranted purely on the basis that the Legislature made the distinction—notwithstanding the fact that there was no evidence to support the distinction's rationality in the first place.

Deference is unwarranted here. Its source, according to the district court, is *NTEU*'s statement that the Supreme Court has an "obligation to defer to considered congressional judgments about matters such as appearances of impropriety." 513 U.S. at 476 (quoted at ER-17). But the district court cut off the passage just when the Supreme Court was explaining how that deference operates: the Court ruled that this presumption was overcome in *NTEU* given "*the record of [that] case.*" *Id.* (emphasis added). And then the Court summarized its reasoning: "[A]nomalies in the text of the statute and regulations underscore our conclusion: The speculative benefits the honoraria ban may provide the Government are not sufficient to justify this crudely crafted burden on respondents' freedom to engage in expressive activities." *Id.* at 477. *NTEU* thus stands for the opposite of what the district court relies on it

42

for. Although courts may start with a presumption that "*considered* [legislative] judgments" get deference, the judgments must in fact be considered, and the presumption can be overcome given anomalous statutory text, "speculative benefits," and the "record of [a] case." *Id.* To that extent the Legislature started with any presumption of deference here, that presumption has been overcome for all of those reasons.

Finally on this point, it is not just that any supposed benefits from the ban on personal political solicitations for local employees only would be "speculative." It is worse than that: the State stipulated there is no evidence of any benefit to banning *this specific speech*. In particular, the core political speech that Plaintiffs seek to voice has been permitted for state employees, but the State has *no record* of *any harm* coming from personal political solicitations from one state employee to another. ER-137–38, ¶¶ 29–30. Indeed, the Attorney General himself (the nominal defendant in this case) heads a state agency that permits all of its employees to engage in the very political speech at issue here: requesting a political donation from a co-employee, so long as the request is not coercive or suggestive, does not come at work, and does not use state resources. ER-138–39, ¶¶ 32–33. And yet there is nothing either in this

record or the legislative record more broadly indicating that this absence of regulation has caused the State or its agencies any harm. Thus, the State's argument that a ban on the analogous speech by local employees is worse than "speculative"; it's conclusively put to rest by the State's own evidence.

### B. The State's *Post-Hoc* Arguments in Support of The Differential Treatment Fail

As stated, there was no evidence before the Legislature supporting a selective speech ban on local employees. That may well end the inquiry, because it is not clear that the State even can support a First Amendment restriction with only *post hoc* reasoning. *E.g.*, *Minority Television Project, Inc.*, 676 F.3d at 880 ("[T]he government must prove both the reality of the recited harms and that the statute does not burden more speech than necessary" with "substantial evidence in the [legislative] record."). Nonetheless, all of the *post hoc* reasons offered by the State and the district court fail.

The district court put most of the analytical weight for the distinction on a purported interest in uniformity of regulation. According to the district court, "the level of oversight for state and local employees is significantly different." ER-24. In particular, while state agencies, like

44

local agencies, generally make their own employment rules, "state agencies must still submit these rules to [the California Department of Human Resources, known as CalHR] for approval." ER-24. By contrast, there is no "similar oversight across the State's approximately 3,000 local agencies." ER-24. Thus, the district court claimed, without § 3205, "these local agencies would be left to police themselves." ER-25. This purported interest in uniformity cannot support the broad speech ban here.

The primary problem with this *post hoc* reasoning is that an interest in uniformity is not related to the differing scope of speech restrictions in either conception or implementation. Take a particular example that the Plaintiffs offered and the facts of which the district court did not disagree with:

> A law clerk in a state judge's chambers may solicit political contributions for a judicial candidate from one of her two or three fellow clerks at a Friday happy hour and sit next to the other clerk the following week; meanwhile, a Los Angeles County janitor may not solicit contributions for a Presidential candidate from a Los Angeles County prosecutor at a barbecue that they both happen to attend with family, even though both are among approximately 100,000 county employees, and even though they may go to work more than 85 miles (and an hours-long drive in LA traffic) from each other.

ER-25–26. The district court claimed this bizarre distinction in California law is supported by the fact that the judge's clerks all have "a single entity—CalHR—that is responsible for rules governing their employment and providing guidance." ER-25. But that supposedly valuable resource has nothing to do in this example, because those political solicitations are *permitted* for state employees; CalHR isn't implicated. By contrast, that speech is banned for the locally employed janitor. That is illogical.

This shows that the State's reliance on "uniformity" was doomed from the outset. The State and the district court do not point to any case where an interest in "uniformity" was used to support a differential scheme of substantive regulation. Such an interest could support a difference in resources or procedures: given that CalHR exists, it could make sense for Legislature to appropriate different amounts of money for, say, enforcement of anti-corruption laws among state versus local employees. And it would probably mean there would need to be different ways for state versus local employees to, for example, report corruption when they see it. But the existence of CalHR does not let the Legislature invent different substantive rules that infringe political speech unless

46

there is a reason that the speech is more harmful from local employees than from state employees. The existence of CalHR says nothing on that score. It is the classic example of a distinction without a difference.

Finally, the district court also initially relied in part on the somewhat related idea that there are "differences in scale between state and local agencies." ER-163. The district court did not substantially rely on this rationale in its later summary judgment opinion, and that may be because it lacks factual support. To take one example: § 3205(a) applies to agencies like Los Angeles County, with 100,000 employees; Los Angeles City, with another 50,000; and Santa Clara County, with 22,000, ER-136, ¶¶ 20–22, forbidding employees of those agencies to solicit *any* of their tens of thousands of colleagues. Meanwhile, the law permits the same speech if made by state employees of departments large (like the Department of Corrections & Rehabilitation, with 66,000 employees), small (the San Joaquin River Conservancy, with four employees), and in between.[4] Difference in scale cannot be a valid distinction, because there is no noticeable difference in scale.

———————————

[4] The current employee count of every California state department is available at https://publicpay.ca.gov/reports/State/State.aspx.

\* \* \*

Given the level of First Amendment protection accorded political speech, the California Legislature's differential treatment requires "independent justification." *SEIU*, 955 F.2d at 1319 n.11. But it has none. The district court's attempt to find one relied heavily on deference to legislative decisionmaking. That was error, because this is not ordinary lawmaking. Instead, core First Amendments interests are at stake. *Compare Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 487 (1955) (describing rational basis standard for ordinary economic regulation) *with*, *e.g.*, *McCutcheon*, 572 U.S. at 191, 197 (because "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders," rules impacting political speech must be "closely drawn to avoid unnecessary abridgement of associational freedoms" (quotation marks omitted)). Because the record reveals that there is no good reason for the distinction between state and local employees, the district court's judgment must be reversed.

## CONCLUSION

This Court should reverse the district court's order granting summary judgment in favor of Bonta and direct the summary judgment be entered in favor of Plaintiffs.

Dated: June 10, 2022

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
Telephone: 323-744-5293
jason@gerstein-harrow.com

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
Telephone: 202-670-4809
charlie@gerstein-harrow.com

*Attorneys for Plaintiff-Appellant*

49

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure and Circuit Rule 32 because this brief contains 9,437 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ Jason Harrow

*Counsel for Plaintiff-appellant*

June 10, 2022