## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| PROGRESSIVE DEMOCRATS FOR SOCIAL JUSTICE, KRISTA HENNEMAN, and CARLIE WARE, Plaintiffs-Appellants, <br><br> *v.* <br><br> ROB BONTA, in his official capacity as Attorney General for the State of California, Defendant-Appellee. | Case No. 22-15323 |

*On Appeal from the U.S. Dist. Ct. for the Northern District of California No. 21-cv-3875, The Hon. Haywood Gilliam*

## REPLY BRIEF OF APPELLANTS

*/s/ Jason Harrow*
Jason Harrow
Charles Gerstein
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
Telephone: 323-744-5293
jason@gerstein-harrow.com

*Attorneys for Plaintiff-Appellant*

November 2, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ...................................................... iii

PRELIMINARY STATEMENT .................................................. 1

ARGUMENT ............................................................................. 3

I. CLOSE SCRUTINY APPLIES TO DISCRIMINAION
REGARDING WHICH EMPLOYEES MAY SOLICIT
POLITICAL CONTRIBUTIONS FROM OTHER
EMPLOYEES ....................................................................... 3

    A. The Equal Protection Clause and The First Amendment
Both Require That Distinctions in Groups Permitted To
Engage in Political Speech Be Justified. ................................. 3

    B. The *Pickering* Test Does Not Apply ......................................... 6

II. THE DISTINCTION IN SECTION 3205 IS NOT CLOSELY
TAILORED TO ANY RATIONAL GOVERNMENT
INTEREST, LET ALONE A COMPELLING ONE ........................ 12

    A. The Legislative Record Offers No Support For The
Differential Treatment Between State And Local
Employees ............................................................................. 13

    B. The State's *Post-Hoc* Arguments in Support of The
Differential Treatment Fail ...................................................... 19

    C. The Supreme Court Has Not Already Answered This
Question. ................................................................................ 22

CONCLUSION ........................................................................ 26

CERTIFICATE OF COMPLIANCE ....................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Blount v. Rizzi*, 400 U.S. 410 (1971) ............................................................ 8

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).......................................... 23

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)................. 3, 4

*Citizens United v. FEC*, 558 U.S. 310 (2010) ............................................ 3

*Harwin v. Goleta Water District*, 953 F.2d 488 (9th Cir. 1991).................................................................................................... 4

*Minority Television Project, Inc. v. FCC*, 676 F.3d 869 (9th Cir. 2012) ........................................................................................... 13

*Minority TV Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013)................................................................................................... 13

*Perry v. Los Angeles Police Department*, 121 F.3d 1365 (9th Cir. 1997) ........................................................................................ 4, 5, 6

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ............................ 7

*Reno v. ACLU*, 521 U.S. 844 (1997)........................................................... 7

*SEIU v. Fair Political Practices Commission*, 955 F.2d 1312 (9th Cir. 1992) ........................................................................... 3

*Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994) ................... 12

*Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180 (1997) .................................................................................................. 13

*United Public Workers v. Mitchell*, 330 U.S. 75 (1947) .................... 22, 23

*United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ........................................................................... 11, 12

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) .................................... 24

**Statutes**

5 U.S.C. § 1501(4) ...................................................................... 16

74 Oklahoma Stat § 840-5.5 (2021), *repealed by* Okla.
    Session Laws 2022, c. 243, § 27 ...................................................... 24

**Other Authorities**

The Statistics, 135 Harv. L. Rev. 491 (2021) ......................................... 18

## PRELIMINARY STATEMENT

As Plaintiffs explained in their Opening Brief, California Government Code § 3205 unconstitutionally discriminates against Plaintiffs in their exercise of the fundamental right of political speech. California state law makes it a crime for any *county* employee in California to solicit any political contribution from any other employee of the same county, but it allows any *state* employee to solicit a political contribution from any other state employee. Decades ago, the Governor's most senior advisor on the topic urged a veto of the bill creating this distinction on the grounds that he could "find no reason for this unique treatment of State employees, vis-à-vis local agency employees." ER-100. On appeal to this Court, the State has still offered no good reason for the unique treatment. The discriminatory restriction should be invalidated.

The State spends the bulk of its brief defending a proposition that is simultaneously uncontested, irrelevant, and self-defeating: that a properly drawn law could prohibit *all* public employees from soliciting political donations. State Br. 21–40; 50–52; *see, e.g.*, State Br. 21 (Heading: "The State May Restrict the Solicitation of Political Contributions by Government Employees."). That point is uncontested

1

because Plaintiffs do not ask this Court to revisit the *Broadrick*/*Letter Carriers* line of cases, and they recognize this Court could not do so even if it wished to. Opening Br. 24 ("All agree that these interests could support a prohibition on political solicitation by *all* of California's public employees."). The point is irrelevant because it does not address the fundamental question, which is whether the distinction between state and local employees is unconstitutional. And it is self-defeating because the State's claim that public employees are a "group that *needs* protection from such political solicitations" (State Br. at 33, with emphasis added) proves Plaintiffs' point: if *all* public employees "need[]" such protection but only local employees get it, then the law, by definition, unconstitutionally discriminates in the exercise of a fundamental right.

In the end, the State's argument fails because it is an attempt to defend the indefensible. There is no good reason, in the record or otherwise, to distinguish between state and local employees when it comes to banning political solicitations. If this law were subject to ordinary, rational basis review, perhaps mere deference to the Legislature's haphazard distinction would suffice. But political speech is at stake. This Court is thus obligated to make the Legislature do better.

## ARGUMENT

### I. CLOSE SCRUTINY APPLIES TO DISCRIMINAION REGARDING WHICH EMPLOYEES MAY SOLICIT POLITICAL CONTRIBUTIONS FROM OTHER EMPLOYEES

#### A. The Equal Protection Clause and The First Amendment Both Require That Distinctions in Groups Permitted To Engage in Political Speech Be Justified.

The State tries to tease apart the First and Fourteenth Amendment aspects of this case in the hope that isolating each claim results in a lighter burden. *See* State Br. 53–58 (treating Equal Protection Claim separately). But in fact the Supreme Court and this Court have treated claims like those here through the lens of both provisions: as discrimination of the exercise of a fundamental right. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (the First Amendment "[p]rohibit[s] . . . restrictions distinguishing among different speakers, allowing speech by some but not others."); *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 (1993) (invalidating an ordinance banning newsracks containing "commercial handbills" but permitting the same racks containing "newspapers" because there was "insufficient justification for the discrimination."); *SEIU v. Fair Political Practices Commission*, 955 F.2d 1312, 1319 (9th Cir. 1992) ("[D]iscrimination is

3

permissible in the First Amendment context only when the discrimination is itself necessary to achieve a substantial governmental interest."); *Perry v. Los Angeles Police Department*, 121 F.3d 1365, 1368 (9th Cir. 1997) (striking down an ordinance that permitted non-profit enterprises to solicit donations on Venice Beach but barred solicitations by others, including unincorporated groups); *Harwin v. Goleta Water District*, 953 F.2d 488, 491 n.6 (9th Cir. 1991) ("Whether analyzed under the First Amendment or under the Equal Protection Clause of the Fourteenth Amendment, discriminatory burdens on First Amendment rights have typically been subjected to strict scrutiny." (citation omitted)).

The State mostly ignores this line of precedent. It does not cite *Perry* or *Discovery Network*, even though they were discussed extensively in Plaintiffs' Opening Brief and are directly on point. Both binding cases address discrimination in the context of First Amendment speech, exactly what is at issue here. *See* Opening Br. 20, 24, 26, 28, 29 (discussing cases). The government indeed must have a meaningful justification for discriminating among different speakers in the exercise of protected speech. *Discovery Network*, 507 U.S. at 418 (rejecting the

4

government's proffered justification as "insufficient"); *Perry*, 121 F.3d at 1370 (noting the proper inquiry was the "same" as in *Discovery Network*, namely whether "the means the government uses to discriminate are narrowly tailored to fit its interests").

The State mentions the other cited cases describing the proper standard, but its attempt to distinguish them fail. After claiming that *Harwin*, *Citizens United*, and *SEIU* are all "inapposite" for some unspecified reasons (at State Br. 44 (*Harwin*), 53 (*Citizens United* and *SEIU*), it proceeds to argue that the record here supports the discrimination such that the law can survive the exacting scrutiny that those case make clear applies, *see id.* at 44, 53. That is not so: as Marty Morgenstern said in 1976, and as explained in more detail below (at § II), there is "no reason for this unique treatment of State employees." ER-100. Under the proper standard, that total lack of evidence means the law must be invalidated.

Finally on this point of the constitutional standard, the State, in trying to analyze the claim separately under the Fourteenth Amendment, attempts to bolster the District Court's incorrect secondary argument that it need not even consider whether the law is

constitutionally discriminatory because state and local employees are not "similarly situated." State Br. 56. This is a red herring. The State points to no speech case where courts have first asked whether those barred from speaking are "similarly situated" to those who may engage in the relevant political speech. That makes sense: it is beyond dispute that all Americans who wish to engage in political speech possess First Amendment rights, so the only relevant question is whether the government is unconstitutionally granting some citizens more rights than others. *See, e.g.*, *Perry*, 121 F.3d at 1370 (invalidating distinction between for-profit and non-profit solicitors without first addressing the "similarly situated" question). Any attempt to prohibit courts from performing the required close scrutiny analysis is an invalid attempt to short circuit an important constitutional question.

## B.   The *Pickering* Test Does Not Apply

The State asks this Court to repeat the District Court's threshold error by taking the unprecedented step of analyzing the distinction here under the so-called *Pickering*/*Garcetti* framework. State Br. 28–37. It is not entirely clear that using this framework makes any difference, because the balancing test as applied to prospective speech regulations

is relatively searching, and the law cannot survive the inquiry. Nonetheless, explaining why this framework is not applicable helps illuminate many of the law's flaws. *Pickering* does not apply because it does not apply to criminal sanctions, cannot be invoked against non-employees, and is non-sensical as applied to a claim of discrimination.

*First*, as Plaintiffs explained in their opening brief, the framework derived from *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny arises because the government "has interests *as an employer* in regulating the speech of *its employees* that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568 (emphasis added). *Pickering*, then, does not apply by its own terms to a criminal prohibition, because the government does not jail citizens who disrupt government workplaces. When the State puts someone in jail, it acts as sovereign, not as employer. As Plaintiffs explained, that is often a more serious matter that gets a different analysis. *See* Opening Br. 33–34 (explaining doctrine and citing several cases on this point, including *Reno v. ACLU*, 521 U.S. 844 (1997)).

Remarkably, the State does not dispute this. It does not address Plaintiffs' supporting caselaw, and it has not found a single case since

*Pickering* was decided in 1968 applying that framework to a criminal prohibition. State Br. 39–40. Undeterred, the State argues that *Pickering* can still apply because "the Supreme Court has never stated that *Pickering* does not apply to such laws if they happen to include criminal sanctions." State Br. 40. But of course it hasn't: no court has yet the made category error of trying to analyze a criminal law under *Pickering*, so the Supreme Court would have no reason to specifically reject the proposition. There is no doctrinal reason to grant the State additional solicitude under the First Amendment to control a public workplace by jailing those who exercise political speech in a way that the government believes would interfere with the workplace.[1]

---

[1] The State makes the novel argument that, to the extent criminal penalties require heightened scrutiny that would then invalidate the law, doing so "would not mean that the prohibition in Section 3205(a) is invalid." State Br. 27. Instead, "[i]t would at most restrict the ability to bring criminal cases under section 3205(d)—leaving intact the ability to impose any civil or employment sanctions that may exist under other law." *Id.* The State cites no caselaw that would permit this Court to redraft the law to change the enforcement mechanism, and Plaintiffs oppose the rewrite. The law either stands or falls as written. *E.g.*, *Blount v. Rizzi*, 400 U.S. 410, 419 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute.").

8

*Second*, the State ignores the fact that applying *Pickering* is particularly odd here because the State is attempting to assert its interest as an employer even though it does not employ Plaintiffs. The State explains in detail how California has a centralized HR agency for its employees (at State Br. 5–6), but Plaintiffs are not employees of the State and, as the State emphasizes, is not subject to regulation by CalHR. The State nowhere explains how it can invoke the *Pickering* balancing test to regulate a workplace that it does not control, and, once again, it fails to cite any similar case.

*Third*, *Pickering* is also inapplicable because it is an individualized balancing test that has no way of capturing the discriminatory treatment aspect of this case. The State argues that § 3205 is permissible "under the *Pickering* balancing because the important governmental interests it advances outweigh the limited burden placed on Plaintiffs and local agency employees." State Br. 30. But, as the State's discussion makes clear, the test itself does not analyze the justification for distinguishing among types of public employees. The State argues that the law is supported by the governmental interest in ensuring that job performance does not depend on political affiliation (at State Br. 30–31); that

9

"government and its employees both in fact avoid practicing political justice and appear to the public to be avoiding it" (at State Br. 31, with quotation marks omitted); and that employees are not "pressured or compelled" to support candidates with whom they disagree (at State Br. 32). This is all true but irrelevant. After all, every one of these interests applies exactly equally to state government employees. The first prong of the *Pickering* balance, then, tells us only whether any law limiting the political activity of public employees can be justified. It does nothing to tell us whether the discriminatory aspect of the law has any support.

So too with the other side of the *Pickering* balance. "[T]he burden on Plaintiffs and other local governmental employees is modest," says the State. State Br. 33. But, once again, the burden on state governmental employees would be exactly equal to the burden on local employees. One can substitute *any* public employee into the *Pickering* test—state, city, county, teacher, janitor, or paralegal—and the analysis is identical. The *Pickering* test, then, can help answer only the question that is undisputed: whether the government may ban solicitations by public employees (answer: yes, it can, in theory). But the test, by design, cannot illuminate the disputed question in this appeal: whether the government

10

may ban solicitations by local employees but not state ones (answer: it may do so only if it can justify the distinction, which it cannot here).

Finally, as Plaintiffs explained in their Opening Brief, even assuming *Pickering* applies, a particularly searching version of it applies here and requires the State to use evidence to justify its discriminatory ban. Opening Br. 36–37. The State does not dispute that the standard from *United States v. National Treasury Employees Union* ["*NTEU*"], 513 U.S. 454 (1995), would apply, but it claims that Plaintiffs "misread" the case. State Br. 34. Per the State, *NTEU* does not "require that the government provide data or other evidence to demonstrate that Section 3205 has had positive impact on local agencies and their employees" but rather, under *NTEU*, "courts consider the nexus between the challenged law and the government employment." State Br. 34. That is not what the Court said. The paragraph outlining the relevant standard is reproduced below, and the Court's holding is not consistent with the State's account of the import of the case:

> The fact that § 501 [i.e., the provision at-issue that was invalidated] singles out expressive activity for special regulation heightens the Government's burden of justification. [Cite.] As we noted last Term when reviewing the Federal Communications Commission's must-carry rules for cable television systems, "[w]hen the Government defends

a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System v. FCC*, 512 U.S. 622, 664 (1994). That case dealt with a direct regulation of communication by private entities, but its logic applies as well to the special burden § 501 imposes on the expressive rights of the multitude of employees it reaches. As Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. . . . To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." [Cite.]

*NTEU*, 513 U.S. at 475–76 (citations cleaned up or omitted, as indicated).

Thus, whether § 3205 can withstand constitutional scrutiny turns on whether there is any reasonable justification for the discrimination in the statute. As explained in detail below and in the Opening Brief, there is not.

## II. THE DISTINCTION IN SECTION 3205 IS NOT CLOSELY TAILORED TO ANY RATIONAL GOVERNMENT INTEREST, LET ALONE A COMPELLING ONE

It is admittedly unclear from the relevant caselaw whether, to sustain § 3205(a) under a constitutional challenge, a court looks only to

the legislative record or can go beyond that record to post hoc justifications.[2] In this appeal, it does not matter. There is no evidence, from 1976, 2022, or anytime in between, that can support the distinction between state and local employees.

### A. The Legislative Record Offers No Support For The Differential Treatment Between State And Local Employees

As explained in Opening Brief, the relevant distinction between state and local employees appeared in 1976. The legislative record contains no stated explanation for the differential treatment, and the district court cites none from the record. In its brief, the State does not

---

[2] The State correctly points out that, as a secondary citation in the Opening Brief, Plaintiffs mistakenly cited to the withdrawn panel opinion in *Minority Television Project, Inc. v. FCC*, 676 F.3d 869 (9th Cir. 2012) rather than to the en banc opinion that replaced it at *Minority TV Project, Inc. v. FCC*, 736 F.3d 1192 (9th Cir. 2013) (en banc). The State is right, and Plaintiffs apologize for the error. But the analysis does not change. Plaintiffs cited *Minority Television* only as secondary support for the uncontroversial proposition that, in First Amendment cases, courts have sometimes, though not always, suggested that the relevant evidence to support the restriction must have been before the legislative body. *See, e.g.*, *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 211 (1997) ("[T]he question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress."). Accordingly, in this case, the Parties have analyzed both the legislative record and the State's post hoc justifications.

attempt to explain in any detail how and why the Legislature decided that state employees should not be prevented from "intentionally target[ing] their co-workers with a partisan political solicitation" even though the State claims that all government employees "need[] protection from such political solicitations." State Br. 33. If such protection were truly necessary, then the State should acknowledge it was error to exempt state employees from the coverage of § 3205. It has not done so.

Instead, the State's account is based mostly on inference from materials that were not created by the Legislature. It primarily relies on two letters from the Cities of Los Angeles and Sacramento opposing the proposed lessening of regulation on *all* California public employees. State Br. 31–32 (citing ER-104 and ER-86).[3] But this supposed evidence has several clear problems.

---

[3] The letter from the City of Los Angeles was actually addressed to Governor Brown and urged a veto of the signed bill, *see* ER-104 (noting a "veto of AB 4351 would be greatly appreciated"); the letter thus was not even before the Legislature, and Los Angeles expressed no specific view on the distinction at issue. It is thus unlikely this letter has any evidentiary value when considering the Legislature's reasoning in drawing the distinction between state and local employees.

14

The primary problem with the State's account is that both the State Personnel Board and the State Business and Transportation Agency *also* opposed the lessening of restrictions for state employees, on essentially identical grounds to that of Sacramento's objection to the easing of restrictions on local employees. *Compare* ER-84 (State Personnel Board noting that the "the proposed amendments . . . would be detrimental to the administration of a State service merit system free from the debilitating effects of political influence and patronage") *and* ER-102 (state agency recommending veto because "[p]ermitting public employees to solicit contributions or support from fellow employees can create discomfort or an obligation to respond") *with* ER-86 (City of Sacramento urging the State not to authorize "any activity by a public employee which could disparage his [or her] employer in the eyes of the public by associating it with the political interests of the employee."). The legislative record offers no explanation for why the Legislature changed the law to respond to the local agencies' concern but not those same concerns with respect to state employees.

The State attempts to invent a rationale for the Legislature, but the State's account is not supported by the record. The State posits that it

15

must have had something to do with the coverage of the federal Hatch Act, so it points out that the State Personnel Board's discussing how the federal Hatch Act might apply to some state employees. State Br. 13 (citing ER-98). But the State doesn't explain how this would impact anything, because it wouldn't. For one thing, the Hatch Act applies to both state and local employees, so there's no difference there. *See* 5 U.S.C. § 1501(4) (defining a covered employee as an "individual employed by a State or local agency"). And the State's point ignores the fact that the Board *opposed* lessening the restrictions notwithstanding the Hatch Act, *see* ER-84 (opposing change). Further, there is no evidence the Legislature considered this rationale.

The only other legislative document the State relies on is a memo by the Bill's author, John Vasconcellos, *see* State Br. 13 (citing ER-105), but the State's selective quotations from that document render the State's account unsupportable. Member Vasconcellos wrote that, in his view *the Bill itself* (not the state HR agency, as the State claims) "guarantees the right to be political, and with plenty of precautions and protections." ER-105. Vaconcellos continued by saying that "it's time that we trusted employees to take care of themselves" and concluded that "we

16

can and ought afford *public employees* these vital rights." ER-105
(emphasis added). In other words, the Vasconcellos letter provides no
evidence whatever that the Bill's author, or anyone else in the
Legislature, attempted to justify the distinction between state and local
employees. The opposite is true: Vasconcellos apparently thought it
would be justified to lessen restrictions on *all* "public employees," but
some unspecified political favoritism resulted in easier passage with
restrictions eased for state employees only. *See* ER-85 (City of
Sacramento withdrawing its objections after "work[ing] out"
amendments with Vasconcellos, for unexplained reasons).

An additional problem for the State is the Morgenstern memo, in
which the Governor's chief advisor in this area urged a veto because he
saw "no reason for this unique treatment of State employees, vis-à-vis
local agency employees." ER-100. The State's attempt to minimize
Morgenstern's stating the obvious is bizarre. Citing the unrelated fact
that U.S. Supreme Court opinions are often non-unanimous, the State
argues that "the mere existence of such disagreement does not mean that
the Legislature was wrong in the conclusions that it in fact drew." State
Br. 46. This is a non sequitur. Morgenstern's point in his memo wasn't

that the Legislature's "conclusions" were wrong; it was that there was no evidence for the Legislature's distinction between state and local employees. The State thus gives no reason to think Morgenstern's observation about the legislative record was wrong, and the State's citation to a 2021 Harvard Law Review article on the prevalence of Supreme Court dissents does not change the Legislature's lack of attention to this question in 1976. *See* State Br. 46 (citing The Statistics, 135 Harv. L. Rev. 491 (2021)).

The State also claims that "the Legislature acknowledged that State employees were in a quite different situation than local employees," (State Br. 42), but this is wrong. The Legislature never made such an acknowledgment on the record, and the State does not cite any such acknowledgment. Instead, it cites only a Bill Report by the State Personnel Board—which, as mentioned, actually *opposed* the easing of restrictions on state employees—and the aforementioned Vasconcellos letter, which also mentions the State Personnel Board's opposition and, as explained, does not contain anything close to a legislative acknowledgment that the state and local employees were differently situated. *See* State Br. 42 (citing only ER-98 and ER-105).

18

Finally on this point, it is noteworthy that the State does not endorse the District Court's reasoning that it "must give some deference to the reasoned decision-making of the California Legislature in adopting and upholding § 3205 over the past several decades." ER-17. The District Court cited no actual reasoning or evidence to which a court could defer. Its circular reasoning implies that courts should defer to legislative judgments about who can exercise fundamental rights purely on the grounds that legislatures must have had some reason for making the distinctions they drew. While this essentially total deference to unreasoned legislative judgments could perhaps support an ordinary economic regulation subject to rational basis review, it has no value in this case, which deals with fundamental rights subject to some level of scrutiny above standard rational basis.

## B. The State's *Post-Hoc* Arguments in Support of The Differential Treatment Fail

The State argues at length that differences between state and local employees in terms of "uniformity and oversight" justify prohibiting political speech by local employees but permitting the same speech by state employees. State Br. 49. But, although it is true that there are some differences among the two groups along this axis, the State fails to

explain why that means state employees can be exempt from this restriction.

The State spends pages explaining, in different ways, that local agencies "have no equivalent to the single entity that oversees state employees"—namely, the state agency now called CalHR. State Br. 48 (quotation marks omitted). There is no dispute about this. But the State does not adequately explain why the presence of a centralized HR authority means that somehow state employees need not be subject to restrictions on political speech that are supposedly critical to protect the independence of local employees.

The State claims that "all of the oversight put in place to monitor state employees and the operation of state government serve to prevent corruption, the appearance of corruption, and protect state employees and their rights" but "no similar mechanism operates for local governments." State Br. 47. But this difference does not explain why a flat ban on political solicitation between local agency employees makes any sense as a way to close this supposed oversight gap. The contrary is true: the State has not identified any state agency that has implemented a broad anti-solicitation rule like that in § 3205(a). Rather, the State

stipulated that, at least in modern memory, *no* state employee has *ever* been disciplined for making such political solicitations. ER-137–38 (at ¶¶ 29–30). It defies logic for the State to repeatedly contend that a broad solicitation ban is crucial to "maintain[] an efficient and coercion-free workplace" (at State Br. 2) while simultaneously acknowledging that it has never been applied to state employees themselves.

The State, at one point, recognizes this lacuna but again refuses to explain it. It contends that "[t]he oversight provided by CalHR and the organization of state civil service employment helps to ensure that state civil service continues to be a merit based system that is free of political patronage—making the Section 3205 restrictions unnecessary as to state employees." State Br. 43. The conclusion doesn't follow from the premises. The State does not provide evidence for the notion that centralized oversight of state employee activity somehow renders innocuous a political solicitation from a state-employed paralegal but would criminalize the same solicitation if made by a paralegal employed by a county. Either the speech is detrimental to the operation of a public workplace, or it isn't. If the speech is concerning, as the Legislature apparently thought, then the First and Fourteenth Amendments demand

that the laws proscribing it not discriminate in who can speak without a reasoned justification for that discrimination. But the fact that state employees work for the state, which has a different HR system than localities, is just a truism, not a reason for discrimination in protected speech.

## C.   The Supreme Court Has Not Already Answered This Question.

Finally, citing both *Broadrick* and *Mitchell*, the State suggests that the Supreme Court has already held that legislatures may discriminate among whole classes of public employees in coverage of a restriction on political speech. State Br. 54–55. This is wrong.

The State first cites *United Public Workers v. Mitchell*, 330 U.S. 75 (1947), which upheld the federal Hatch Act, and contends that the Court held that "such distinctions [between types of employees] were 'differences in detail so far as the constitutional power under review is concerned.'" State Br. 54 (quoting *Mitchell*, 330 U.S. at 102). The quotation the State chose in fact was used for the opposite proposition: that the Hatch Act's coverage was not overly broad, not that it was overly narrow, as the State implies. In that passage from *Mitchell*, the Court addressed the "suggestion that administrative workers may be barred,

constitutionally, from political management and political campaigns while the industrial workers may not be barred, constitutionally, without an act 'narrowly and selectively drawn to define and punish the specific conduct.'" 330 U.S. at 102. The Court rejected the proposition that it was required to exclude industrial workers because "Congress has determined that the presence of government employees, whether industrial or administrative, in the ranks of political party workers is bad." *Id.* at 102. In other words, this passage confirms what the Plaintiffs have been saying all along: once the California Legislature determined that intra-governmental political solicitations pose a problem, it can solve that problem by banning the solicitation by all public employees. What it cannot do, and what *Mitchell* provides no support for, is to pick and choose the law's coverage without a reasoned justification.

The other Supreme Court case the State claims governs this question is a footnote in *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), but again that footnote does not do the work the State wishes. In *Broadrick*, the Supreme Court confirmed the uncontroversial proposition that, where a political restriction applies to classified employees and not unclassified ones, "a legislature must have some leeway in determining

23

which of its employment positions require restrictions on partisan political activities and which may be left unregulated." *Id.* at 607 n.5. This is uncontroversial: the distinction between career civil servants on the one hand and political appointees, high-level managers, or temporary employees on the other is well-established.[4] It makes sense to grant legislatures leeway to regulate political speech along those lines, or other natural ones that are actually related to job duties and performance. For instance, as the Supreme Court has expressly held, judges may be subjected to restrictions different from all other public employees. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (upholding restriction on personal solicitation of campaign funds by elected judges). But that doesn't mean that a legislature may ban important speech for one group of employees but permit it for others for a reason unrelated to the nature of their job. In any event, to grant legislatures some "leeway" is not to give them unlimited license to infringe political speech rights for no good reason. That is what occurred here.

---

[4] Until a recent rewrite of the laws governing state employment that changed the relevant terminology, the list of unclassified employees in Oklahoma as of 2021 was codified at 74 Oklahoma Stat § 840-5.5 (2021), *repealed by* Okla. Session Laws 2022, c. 243, § 27.

* * *

There is no dispute that § 3205(a) infringes the political speech rights of these Plaintiffs and of hundreds of thousands of other employees. If the California Legislature had applied the restriction on personal solicitations to all public employees, or even to a class of public employees reasonably connected with the state's interest in preventing corruption or its appearance, then the infringement would be something Plaintiffs would have to tolerate as the price of minimizing public corruption. But that is not this case. The Legislature has decided to exempt from the restriction wide swaths of the public workforce for no good reason. Lawyers who happen to work for a state agency may solicit political donations from their co-workers, off the clock and outside of work, but lawyers who work for local agencies may not. ER-138–39 (¶¶ 32, 33). The First and Fourteenth Amendments demand that such discriminatory application of a fundamental right be closely scrutinized. The law here cannot withstand that level of scrutiny, so it must be struck down.

## CONCLUSION

This Court should reverse the district court's order granting summary judgment in favor of Bonta and direct the summary judgment be entered in favor of Plaintiffs.

Dated: November 2, 2022

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
Telephone:  323-744-5293
jason@gerstein-harrow.com

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
Telephone: 202-670-4809
charlie@gerstein-harrow.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure and Circuit Rule 32 because this brief contains 5,255 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

<u>/s/ Jason Harrow</u>

*Counsel for Plaintiff-appellant*

November 2, 2022